**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and CAPITOL CMG, INC., | ) | C.A. No. _____ |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| DISTROKID, LLC, KID DISTRO HOLDINGS, LLC, and DK HOLDCO, LLC | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, and Capitol CMG, Inc. (collectively, "UMG" or "Plaintiffs") bring this complaint against Defendants DistroKid, LLC; Kid Distro Holdings, LLC; and DK Holdco, LLC d/b/a DistroKid (jointly, "DistroKid") for deceptive trade practices and copyright infringement. Plaintiffs allege, on knowledge as to themselves and on information and belief as to others, as follows:

## PRELIMINARY STATEMENT

1. DistroKid claims that it is the world's *fastest* and *largest* distributor of newly recorded music.[1] It says it distributes music "10-20x faster than any other distributor," and places tens of thousands of tracks and albums every day on digital music services, claiming to account for 30-40% of newly distributed music.[2] Illegal, deceptive, and unlawful practices fuel

---

[1] DistroKid: Music Distribution Services, https://distrokid.com/ [https://perma.cc/N2P9-PBD7] (last visited Sept. 14, 2026).

[2] *Id.*; Tim Ingham, *CVC Capital Partners to Acquire Majority Stake in DistroKid*, Music Business Worldwide (July 6, 2026), https://www.musicbusinessworldwide.com/cvc-capital-partners-stake-in-distrokid/.

DistroKid's rapid growth—those practices threaten the legitimate players in the music economy. DistroKid is engaged in both deceptive trade practices and blatant copyright infringement.

2. DistroKid misleads the market in critical respects: it gives the false impression (1) that the music DistroKid distributes consists of artist-backed releases, created and owned by real human artists (not AI mass-generated content); (2) that DistroKid acts in furtherance of the Digital Services' policies and the Music Fights Fraud Alliance's initiatives to stop the mass upload of AI "slop" and other manipulative tactics aimed at generating revenue by crowding out human creators; and (3) that DistroKid takes a stance against copyright infringement. In reality, DistroKid embraces all of this bad-actor conduct; doing so benefits its growth and corresponding market valuation. The ramifications are felt by legitimate players in the music industry, including artists, consumers, and Plaintiffs.

3. To understand the impact of DistroKid's conduct (including on Plaintiffs), it is important to understand the chain of distribution for recorded music. Consumers predominantly access music today through digital content services like Spotify, Apple Music, Deezer, YouTube, and social media platforms like Meta/Instagram, Snapchat, and TikTok, among others (collectively, "Digital Services"), where music fans can stream or download tracks. These Digital Services each have negotiated agreements with recorded music companies and music distributors, like Plaintiffs, who are authorized to supply that music to them. Indeed, Spotify and Apple Music, the top Digital Services, contract *only* with distributors who have said they will comply with the Digital Services' policies and standards to maintain the legitimacy and quality of tracks that are made available on the Services. Those authorized distributors, in turn, have relationships and contracts with artists, who choose among recorded music companies or music distributors to enable them to cultivate fans and grow their careers.

4. Plaintiffs are recorded music companies. They find up-and-coming artists, and then invest in developing, producing, and promoting their music. In exchange for these services and a share of future earnings, artists grant Plaintiffs exclusive rights in the sound recordings, which Plaintiffs then license, market, and distribute across a range of physical and digital media.[3] Such lawful distribution provides artists with royalties and financial consideration, as well as the opportunity to share their art with fans and grow their fanbases and careers. In addition to investing in human artists, Plaintiffs also invest in protecting the copyrighted sound recordings from unauthorized distribution or use, including substantial amounts in developing, maintaining, and using content protection and anti-fraud detection systems. The revenues from lawfully distributing their artists' music through legitimate channels, including the Digital Services, provide Plaintiffs the opportunity to recoup their substantial investments, and to generate revenue to support the development of new artists and new music.

5. Together, Plaintiffs and their artists supply music that fans look for on the Digital Services; Plaintiffs' music thus attracts listeners, subscribers and advertisers to the Digital Services. In a well-functioning, artist-centric digital music economy, the value created for fans can be shared across all of those who contribute—artists, record labels/recorded music companies, music distributors, and Digital Services.

6. The current digital music economy is no longer a healthy, functioning one. It has been co-opted by those trying to pass off mass AI-generated, SEO-optimized, and copyright-

[3] Plaintiffs are recorded music companies. Music distribution is an important part of what they do. When they distribute music, they compete with other music distributors, including DistroKid, which markets itself as primarily a music distributor, although it also offers record label services similar to those Plaintiffs offer their artists.

infringing slop as music created and performed by a real human.[4] Real-world music fans are not seeking out these tracks on Digital Services, which means the tracks do not attract subscribers or advertisers. Rather, the infiltration of these falsely represented tracks into the digital music economy takes resources away from legitimate contributors, while polluting the listening experience.[5] At the nexus of this problem sits DistroKid.

7. DistroKid promotes itself to the public and Digital Services as a leading music distributor for artist-backed releases. DistroKid claims that it distributes tracks that are original, authorized, and owned by its account holders (i.e., individuals and entities who have subscribed to use DistroKid's distribution services); that it follows the Digital Services' policies; that it contributes to the mission of the Music Fights Fraud Alliance ("MFFA"); and that the tracks it distributes are *not* "mass-generated spam" and *not* created to "game streaming algorithms or flood platforms with generic content."[6] DistroKid benefits from this reputation as a legitimate music distributor to attract artists, enter into contracts with Digital Services, and ultimately obtain streams for the tracks it distributes.

8. But DistroKid's representations are made of air. In actuality, DistroKid is flooding platforms with AI-generated "slop" that siphons revenue and listeners from the legitimate artists

---

[4] Artists and creative enterprises may use AI as one of many tools in creating, producing, or releasing music and Plaintiffs are not challenging those uses. Plaintiffs use the term "artist-backed release" in this Complaint to mean a release where the artist and distributor are accountable for the accuracy of the metadata and stand behind the ownership and human creativity in the release—as distinguished from "mass-generated" or deceptive releases by content farms or bad actors.

[5] This lawsuit is not about the distribution of AI-generated music when clearly disclosed as such. This lawsuit is about DistroKid masquerading as something it is not and benefiting from that false impression.

[6] DistroKid Help Center, Can I Upload Music Made With AI Tools to DistroKid?, https://support.distrokid.com/hc/en-us/articles/41182362733715-Can-I-Upload-Music-Made-With-AI-Tools-to-DistroKid [https://perma.cc/QXV2-4A9Q] (last visited Sept. 14, 2026).

and rightsholders. DistroKid likewise proliferates infringing tracks across platforms, and continues that distribution even when it knows the tracks infringe Plaintiffs' (or others') rights.

9. The evidence of DistroKid's AI-slop pipeline is significant: one of DistroKid's highest-volume "artists," under the moniker "Lofi Chill," released 4,562 tracks in a single twelve-month period. That is the equivalent of 20-30 full-length albums every month, a pace no human musician could achieve. Other DistroKid "artists," including "Chill Flow Radio" and "Mellow Vibes Radio," each released thousands of tracks in the same period. These "artists" are not artists at all. Their very names are designed only to surface in search results (e.g., for "chill" music) and algorithmic playlists on the Digital Services, in violation of those services' policies and guidelines, and displacing other legitimate tracks, including Plaintiffs'. DistroKid welcomes such bad actors as account holders, even where they have *already* been tagged by the MFFA for streaming fraud at the time they sign up for a DistroKid account. DistroKid permits other bad actors to engage in "ISRC theft,"[7] in which the account holder submits a track under the *same* unique identifying code assigned to one of Plaintiffs' legitimate recordings, so that the impostor track diverts streams and royalties from the legitimate rightsholder.

10. The consequences of this deception fall on the legitimate players in the music economy, including artists, consumers, Digital Services, and Plaintiffs. Every stream captured by a deceptive AI-generated or infringing track diverts listeners and revenue away from real artists, including Plaintiffs' artists; consumers are misled into believing they are listening to genuine music and supporting working artists when they are in fact enriching bot farms and infringers; and the Digital Services believe that they are featuring genuine music on their platforms. The

[7] ISRC stands for "International Standard Recording Code," which is a unique alpha-numeric code assigned to each version of a track by the distributor.

deception also gives DistroKid an unfair competitive advantage: Plaintiffs and others bear the substantial costs of trying to ensure only music backed by authentic artists and legitimately owned is distributed to Digital Services, while DistroKid does none of that work and yet is treated by the market as though it operates on the same terms. A business built on such deception makes competition unfair.

11. Unsurprisingly, DistroKid also engages in massive, blatant copyright infringement. DistroKid has infringed and continues to infringe thousands of Plaintiffs' sound recordings, and discovery will likely show thousands (or more) additional infringing works. Here are just some examples:

12. First, DistroKid distributes tracks that are merely remixes or speed-altered versions of popular sound recordings. Some of these infringing tracks have titles that are identical to the title of the sound recording that they are infringing (e.g., "Love Me Like You Do" for a slowed-down version of Ellie Goulding's hit song "Love Me Like You Do"; "Favorite Song" for four discrete DistroKid tracks that infringe Toosii's song "Favorite Song"). Others refer directly to the title of the infringed sound recording but include a term like "remix," "edit," or "sped up" in the name (e.g., "Favorite Song (Remix)," "Unholy – Radio Edit," "Judas Sped Up").

13. Second, DistroKid distributes infringing tracks that copy the official cover art from the tracks they infringe, making it all the more likely that Digital Service subscribers will select the infringing DistroKid version rather than the authorized version of the song, which, in turn, diverts revenue to DistroKid, at the expense of the lawful rightsholder. That is because, on the Digital Services, a listener searching for a popular song is often presented with multiple versions of the same track, which may include unauthorized copies that sit alongside, and compete directly with, Plaintiffs' authorized versions. Plaintiffs are paid when a listener streams or downloads the

authorized version; they are paid nothing when the listener selects an infringing copy instead. By mimicking the official cover art (and often the exact title), DistroKid's infringing tracks are engineered to capture those confused listeners and the corresponding revenue that belongs to Plaintiffs and their artists.




**Figure 1A**: Copyrighted UMG Sound Recording,
Spotify, Unholy (Feat. Kim Petras) by Sam Smith, Kim Petras,
https://open.spotify.com/track/3nqQXoyQOWXiESFLlDF1hG (last visited Sept. 14, 2026).




**Figure 1B**: Infringing DistroKid Sound Recording,
Spotify, Unholy - Radio Edit by LDS,
https://open.spotify.com/track/2l5E0AcH18cCsTM1PZHwCK (last visited Sept. 14, 2026).

14. Third, DistroKid distributes thousands of sound recordings that infringe Plaintiffs' rights, and that Plaintiffs have been able to identify through the rights-management tools offered by YouTube, TikTok, Meta and other Digital Services. These tools use audio fingerprinting to detect when two parties claim rights in the same recording, and then notify the parties of that conflict. These infringing recordings include wholesale copies of instrumentals from Plaintiffs' sound recordings that simply substitute in new vocals. They also include unlicensed samples of popular sound recordings, included within a longer track, or sometimes entire sound recordings included within a longer compilation of multiple tracks.

15. **Exhibits A** and **B** set forth 1,000 examples of Plaintiffs' works that DistroKid has illegally copied and distributed. These examples are necessarily the tip of the iceberg because Plaintiffs cannot, without discovery, evaluate the millions of other tracks that are not submitted to the rights management tools, or that escape automated detection, but are nevertheless blatantly infringing.

16. DistroKid knows about the infringement the same way that Plaintiffs do: DistroKid receives notice from the rights-management systems of certain Digital Services when a track it distributes matches Plaintiffs' track. DistroKid may then either assert rights in the flagged recording or concede that it has none, either expressly or by declining to act. Time and again, DistroKid concedes that it does *not* have rights in the sound recording. Here is where it gets egregious: *after* acknowledging that it does not have rights in the track, DistroKid *continues* to distribute that exact same recording to *other* Digital Services. Continuing to distribute these infringing tracks allows DistroKid to collect ill-gotten revenues that should have gone to Plaintiffs and other legitimate rightsholders.

17. DistroKid cannot claim ignorance (which wouldn't be a defense anyway). DistroKid has recording-by-recording knowledge and has made a business decision to keep infringing everywhere DistroKid has not yet been caught. DistroKid's model of "move fast when it helps us, and move hardly at all when caught red-handed" is a key factor in DistroKid's rapid growth. DistroKid attracts account holders by distributing tracks substantially faster than the competition and continuing to distribute those tracks even after it learns that they are infringing. It also embraces the mass-generated AI spam it is pumping into the music ecosystem, while simultaneously representing to the market that it does no such thing. As DistroKid's account base

grows, so does the company's value. DistroKid's recent $2 billion valuation[8] is the direct result of a business model that disregards its obligations to be truthful in its representations and tramples Plaintiffs' rights.

18. Plaintiffs bring this action to stop DistroKid's market-disorienting practices that mislead for its own gain at Plaintiffs' expense, and to remedy DistroKid's massive infringement and continued efforts to build its business on the backs of Plaintiffs and their recording artists.

## NATURE OF THE ACTION

19. This is a civil action seeking injunctive relief and other remedies for DistroKid's deceptive trade practices in violation of the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2531 *et seq.* ("DTPA"), arising from DistroKid's misrepresentations to the public. 6 Del. C. § 2532(a)(5), (7), (12).

20. This action also seeks damages, injunctive relief, and other remedies for both direct and indirect copyright infringement, under the Copyright Act, 17 U.S.C. § 101 *et seq.*

21. This action further seeks damages, injunctive relief, and other remedies for violations of Plaintiffs' exclusive rights in sound recordings fixed before February 15, 1972 ("pre-1972 sound recordings"), under 17 U.S.C. § 1401, which in relevant part provides that a party who violates an exclusive right under 17 U.S.C. § 106 with respect to such a recording is liable for infringement.[9]

---

[8] Elizabeth Dilts Marshall, *DistroKid Acquired by CVC Capital Partners*, Billboard (July 6, 2026), https://www.billboard.com/pro/distrokid-acquired-cvc-capital-partners/.

[9] As used in this Complaint, except as otherwise specified, references to Plaintiffs' sound recording includes those in which they own copyrights, exclusive licensed rights, or exclusive rights to pre-1972 sound recordings under 17 U.S.C. § 1401, and references to DistroKid's infringement include violations of such rights.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over Plaintiffs' claims arising under the Copyright Act and 17 U.S.C. § 1401 pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

23. This Court has supplemental jurisdiction over Plaintiffs' DTPA claim, 6 Del. C. § 2531 *et seq.*, pursuant to 28 U.S.C. § 1367(a), because that claim is intertwined with, arises from the same nucleus of facts, and forms part of the same case and controversy as the federal claims.

24. This Court has personal jurisdiction over Defendant DistroKid, LLC because it is a limited liability company organized and existing under the laws of the State of Delaware.

25. This Court has personal jurisdiction over Defendant Kid Distro Holdings, LLC because it is a limited liability company organized and existing under the laws of the State of Delaware.

26. This Court has personal jurisdiction over Defendant DK Holdco, LLC because it is a limited liability company organized and existing under the laws of the State of Delaware.

27. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(a) because Defendants are entities organized under the laws of Delaware, reside in this district for venue purposes, and are subject to personal jurisdiction in this district.

## PARTIES

### A. Plaintiffs And Their Extensive Catalogs Of Valuable Sound Recordings

28. Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

29. Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business in Santa Monica, California.

30. Plaintiff Capitol CMG, Inc. is a California corporation with its principal place of business in Santa Monica, California.

31. Plaintiffs own or control the copyrights or exclusive rights in some of the most popular sound recordings commercially exploited in the United States. Plaintiffs' copyrighted recordings include performances of some of the most successful recording artists of all time, including Ariana Grande, Elton John, Kendrick Lamar, Lady Gaga, Nirvana, and Rihanna.

32. Plaintiffs or their exclusive licensors have obtained U.S. copyright registrations for many copyrighted recordings, including those listed in **Exhibit A** hereto. Plaintiffs also own or control the exclusive rights to numerous pre-1972 sound recordings which have been indexed with the Copyright Office, including those listed in **Exhibit B** hereto.

33. Each of the works listed in **Exhibits A** and **B** has been reproduced, publicly performed, and/or distributed by Defendants, their account holders, and/or the Digital Services to which DistroKid delivered the recordings, without Plaintiffs' authorization.

**B. Defendants DistroKid**

34. Defendant DistroKid, LLC is a Delaware limited liability company, organized under the laws of the State of Delaware on September 13, 2018. Its principal place of business is in New York, New York.

35. Defendant Kid Distro Holdings, LLC is a Delaware limited liability company, organized under the laws of the State of Delaware on September 12, 2018. Its principal place of business is in New York, New York.

36. Defendant DK Holdco, LLC is a Delaware limited liability company, organized under the laws of the State of Delaware on August 5, 2021. Its principal place of business is in New York, New York.

37. Defendants own and operate the DistroKid music distribution business, including the website located at www.distrokid.com and related services discussed herein, and are jointly responsible for the conduct alleged herein.

38. On information and belief, DistroKid, LLC and Kid Distro Holdings, LLC are wholly owned subsidiaries of DK Holdco, LLC. On information and belief, DistroKid, LLC; Kid Distro Holdings, LLC; and DK Holdco, LLC jointly developed, approved, and implemented DistroKid's policies and practices governing the review, monetization, and distribution of sound recordings—including the infringing recordings identified herein. To the extent not directly involved, on information and belief, DK Holdco, LLC and Kid Distro Holdings, LLC exercise control over, permitted, directed, approved, and ratified the unlawful conduct alleged herein, and financially benefited, and continue to benefit, from its continuation.

## FACTUAL ALLEGATIONS

### I. Plaintiffs And The Legitimate Market For Online Distribution Of Sound Recordings

39. Real human artists, and the fans who connect with their music, are at the center of the music industry. The industry begins with the creative labor of artists: the ideas they develop, the performances they give, and the recordings they craft—all of which require talent, time, and sustained dedication. The goal of the industry is to create value by building audiences for these artists and entertain listeners.

40. Recorded music companies, including Plaintiffs, play a central role in transforming an artist's creative vision into recorded music that reaches listeners. They aim to find and attract real, up-and-coming human artists looking for a platform for their music, and they invest in creating and producing those artists' sound recordings, developing their careers, and helping them build a fanbase. Recorded music companies, including Plaintiffs, then invest in marketing, promoting and distributing those recordings, including licensing and distributing them to Digital Services.

41. Plaintiffs are among the most well-known and respected recorded music companies in the world. Artists want to work with Plaintiffs because of the talent and dedication Plaintiffs bring to their role in the music industry. Plaintiffs deliver authorized sound recordings to Digital Services pursuant to negotiated licensing agreements and an attendant distribution process that involves administering the rights necessary for lawful distribution, and vetting recordings and their associated metadata to ensure compliance with the Digital Services' policies and standards.

42. Such lawful distribution provides artists the opportunity to share their art with listeners, earn revenue, and grow their careers. Plaintiffs also receive royalties and other consideration generated by the use of these recordings. This revenue allows recorded music companies to recoup their investments, compensate artists, and fund the development and production of new music. Thus, Plaintiffs' ability to distribute and monetize sound recordings through authorized channels is essential to sustaining both individual artists' careers and the broader cycle of musical creation. In the market for music distribution, Plaintiffs compete with other recorded music companies as well as specialized music distributors, including DistroKid, which aim to attract top music talent and distribute their sound recordings.

43. The Digital Services are the key vehicle through which distributors, including Plaintiffs and DistroKid, connect artists and listeners. Consumers predominantly access music today through streams and downloads of tracks available on the Digital Services. To ensure the quality of the recordings on their platforms, the Digital Services maintain policies and standards governing the content, quality, metadata, and rights necessary for a track to qualify for distribution on their platforms. Those policies include prohibitions against the distribution of infringing works and mass-produced, AI-generated tracks manufactured for pure revenue generation, which threaten to divert the attention of listeners from legitimate music. For example, Spotify's policies

make clear that it prohibits AI-deceptive content, including "[s]pam tactics such as mass uploads, duplicates, SEO hacks, artificially short track abuse, and other forms of slop" that are used by bad actors to extract monetary value from the ecosystem.[10] Spotify also prohibits "uploaders [from] fraudulently deliver[ing] music (AI-generated or otherwise) to another artist's profile across streaming services," a practice known as ISRC theft.[11] Other Digital Services take a similar approach to banning infringing and "mass-produced" AI content.[12] And, of course, all Digital Services require that distributors have the rights to the music they are uploading.

44. Any music distributor that wishes to place a sound recording on a Digital Service must comply with the Service's policies. Indeed, Spotify and Apple Music, the top Digital Services, contract *only* with authorized distributors who have been pre-vetted as distributors that have said they will comply with their policies. The Digital Services rely upon distributors to deliver high-quality, legitimate and lawful recordings.

45. Music listeners also rely on distributors to serve as the source for legitimate artist-backed releases, so that listeners are not subject to search and playlist manipulation intended only to line someone's pockets. And artists rely on these distribution channels to ensure their music can reach listeners, and not be drowned out by illegitimate tracks.

---

[10] Spotify Newsroom, Spotify Strengthens AI Protections for Artists, Songwriters, and Producers (Sept. 25, 2025), https://newsroom.spotify.com/2025-09-25/spotify-strengthens-ai-protections/.

[11] *Id.*

[12] YouTube Help, YouTube's Community Guidelines, https://support.google.com/youtube/answer/9288567?sjid=17097112187151434556-NC (last visited Sept. 14, 2026); YouTube Help, Spam Policy, https://support.google.com/youtube/answer/2801973?sjid=12840558690982141445-NC (last visited Sept. 14, 2026).

## II. DistroKid Has Achieved A Meteoric Rise By Cheating The Legitimate Market For Commercial Distribution Of Sound Recordings

46. DistroKid's rise in the marketplace has been noticed. DistroKid was founded in 2013, and claims to have grown to be the largest digital music distributor, purporting to distribute 30-40% of all new music.[13] That growth has been fueled by investment.

47. In 2021, DistroKid sold a stake in the company to Insight Partners, which valued the company at $1.3 billion.[14]

48. And on July 6, 2026, DistroKid announced a majority investment by CVC Capital Partners, after a reported valuation of the company at $2 billion.[15]

### A. DistroKid Represents Itself As A Distributor Of Legitimate Artist-Backed Releases.

49. DistroKid has achieved this explosive growth by holding itself out to the public as a leading commercial distributor for artist-backed releases, with a focus on small and independent artists who wish to self-release music to Digital Services. DistroKid represents to the market—including artists, the Digital Services, and listeners—that it supports the development of such artists by distributing original recordings created by humans for legitimate purposes, with all rights cleared for commercial exploitation.

---

[13] Tim Ingham, *CVC Capital Partners to Acquire Majority Stake in DistroKid*, Music Business Worldwide (July 6, 2026), https://www.musicbusinessworldwide.com/cvc-capital-partners-stake-in-distrokid/.

[14] Insight Partners, *DistroKid Receives Investment from Leading Software Investor Insight Partners Valuing the Company at $1.3 Billion* (Aug. 16, 2021), https://www.insightpartners.com/ideas/distrokid-receives-investment-from-leading-software-investor-insight-partners-valuing-the-company-at-1-3-billion/.

[15] Press Release, CVC Capital Partners, CVC Capital Partners to Make Majority Investment in DistroKid (July 6, 2026), https://www.cvc.com/media/news/2026/cvc-capital-partners-to-make-majority-investment-in-distrokid/; Elizabeth Dilts Marshall, *DistroKid Acquired by CVC Capital Partners*, Billboard (July 6, 2026), https://www.billboard.com/pro/distrokid-acquired-cvc-capital-partners/.

50. For example, DistroKid prominently advertises on its website that its business model is "Artist first, always."[16]




**Figure 2**: Screenshots of DistroKid's Plans and Pricing Page, DistroKid | Plans and Pricing, https://distrokid.com/product/distrokid/plans-and-pricing-2 [https://perma.cc/7TXP-AMUD] (last visited Sept. 14, 2026).

51. DistroKid describes itself as the distributor for "[m]illions of musicians" and features "testimonials" that promote DistroKid as "truly invested in the success of independent artists," and "the best music distributor out there for indie artists."[17] Through such representations, DistroKid promotes itself as a distributor purportedly committed to the musical development of human artists, and the corresponding delivery of their authentic (and non-spam) recordings to the Digital Services and ultimately the consumer.

52. DistroKid also promotes its purported capacity and commitment to delivering sound recordings of a certain standard and quality that satisfy the Digital Services' policies. And it claims to stand against the distribution of AI slop that uses spam tactics such as mass uploads and search-optimization hacks to crowd out legitimate artists. For example, DistroKid proclaims on its website that its "rules" require that "[a]ll music uploaded to DistroKid must follow streaming services' content guidelines," including: (1) "[n]o mass-generated spam," (2) no "gam[ing] streaming algorithms or flood[ing] platforms with generic content," and (3) no uploads of tracks

[16] DistroKid | Plans and Pricing, https://distrokid.com/product/distrokid/plans-and-pricing-2 [https://perma.cc/7TXP-AMUD] (last visited Sept. 14, 2026).

[17] DistroKid: Music Distribution Services, https://distrokid.com/ [https://perma.cc/N2P9-PBD7] (last visited Sept. 14, 2026).

that the account holder lacks the "legal right to distribute."[18] Through such statements, DistroKid represents to artists and consumers that it is committed to preventing the proliferation of low-quality, inauthentic music that could harm the reach of legitimate artist-backed releases.

53. In addition to its public statements, DistroKid has gone as far as joining the Music Fights Fraud Alliance ("MFFA"), a nonprofit association of major rightsholders and distributors that have partnered to detect and prevent streaming fraud.[19] DistroKid therefore presents itself to the world as a distributor that actively prevents streaming fraud and other bad actor tactics.

54. Similarly, DistroKid represents, in the course of its dealings with the Digital Services, that the sound recordings that it distributes are not infringing and are compliant with the Digital Services' policies. Although Plaintiffs are not privy to those conversations, they are a standard part of negotiations between distributors and Digital Services and, indeed, necessary to secure their business. Plaintiffs know because they make the same representations in their own dealings with the same Digital Services. The Digital Services rely on those representations in ingesting, reproducing, publicly performing, and monetizing the recordings that DistroKid delivers.

**B. DistroKid's Representations Are False.**

55. Contrary to DistroKid's representation of its commitment to promoting artist-backed releases and protecting against AI slop and infringing works that threaten real artists' ability to reach listeners, a massive portion of the recordings that DistroKid distributes does not

[18] DistroKid Help Center, Can I Upload Music Made With AI Tools to DistroKid?, https://support.distrokid.com/hc/en-us/articles/41182362733715-Can-I-Upload-Music-Made-With-AI-Tools-to-DistroKid [https://perma.cc/QXV2-4A9Q] (last visited Sept. 14, 2026).

[19] Music Fights Fraud Alliance, The Origins of the MFFA, https://musicfightsfraud.com/about-us (last visited Sept. 14, 2026); Music Fights Fraud Alliance, Our Members, https://musicfightsfraud.com/about-us#members (last visited Sept. 14, 2026).

have the "characteristics" or meet the "standard[s]" or "quality" that DistroKid represents they have or meet. DistroKid has flooded the market with mass-generated AI tracks.

56. Reports from 2021 quoted DistroKid as ingesting 35,000 new tracks every day (more than 1 million tracks per month), with a catalog of "20 million tracks[,] from more than 2 million artists."[20] These numbers have grown substantially in the last five years. DistroKid now claims to distribute for "[o]ver 4 million artists," with a catalog of more than 60 million songs.[21]

57. That massive volume does not reflect legions of original recordings by genuine artists and musicians seeking genuine listeners. DistroKid's catalog is full of AI-generated sound recordings that exist not to entertain human subscribers or grow artist-fan relationships, but to game and profit from the system.[22]

58. Some DistroKid account holders put out multiple full-length albums per month (hundreds of tracks total)—a production rate that would be effectively impossible for any legitimate artist. These so-called "artists" have generic or functional names, AI-generated cover artwork, algorithmically-optimized track names[23], no social media presence, and no other indicia

---

[20] Murray Stassen, *DistroKid is Now Distributing Over a Million New Tracks Every Month*, Music Business Worldwide (May 10, 2021), https://www.musicbusinessworldwide.com/distrokid-is-now-distributing-over-a-million-new-tracks-every-month/.

[21] DistroKid, What is Music Distribution?, https://distrokid.com/resources/what-is-music-distribution [https://perma.cc/K8CZ-JZA3] (last visited Sept. 14, 2026).

[22] *See* Virginie Berger, *How AI-Generated Music Became A $4 Billion Fraud Machine*, Forbes (May 11, 2026), https://www.forbes.com/sites/virginieberger/2026/05/05/how-ai-generated-music-became-a-4-billion-fraud-machine/.

[23] Algorithmically-optimized track names are designed specifically to populate in the results for common keyword searches on the Digital Services (e.g., "mellow vibes," "workout songs") and to be picked up by algorithmic playlists and recommendation systems that surface appropriate tracks for specific moods or situations. This bad-actor tactic is referred to as "SEO hacking" or "algo hacking" and is prohibited by many of the Digital Services. *See* Spotify Newsroom, Spotify Strengthens AI Protections for Artists, Songwriters, and Producers (Sept. 25, 2025), https://newsroom.spotify.com/2025-09-25/spotify-strengthens-ai-protections/.

that there is a real human musician behind the recordings or any genuine interest in growing a fanbase. Their goal is simply to flood the Digital Services with content, in hopes of turning a profit by generating as many streams of as many tracks as possible, be it accidentally, parasitically, or otherwise.

59. For example, DistroKid's highest-volume account holder "Lofi Chill" released 4,562 unique tracks in a 12-month period—averaging out to 380 tracks, or the equivalent of 20-30 full-length albums, per month. "Chill Flow Radio" released 1,901 tracks in the same time period, or 158 tracks per month; and "Mellow Vibes Radio" released 1,615 tracks, or 135 tracks monthly. These "artists'" profiles carry obvious hallmarks indicating that they are not legitimate creators. To begin, their astronomical production rates are implausible for any human artist. Unsurprisingly, technical analysis of these artists' immense catalogs confirms that the vast majority of their tracks (over 97% for Chill Flow Radio and over 98% for Mellow Vibes Radio) are raw outputs from the AI song generator, Suno. Further, their artist names are purely functional, search-optimized genre-related phrases—transparent efforts to maximize streams without regard for genuine artistic value. But DistroKid distributes tracks from such plainly AI-farm-driven account holders.

60. DistroKid's willingness to be a home for such sham artists has inured to its benefit. Its distribution rate has exploded in the AI era. The graph below charts the number of albums released on a weekly basis by major distributors from 2016 to 2026. DistroKid is identified in the chart by its older corporate name, PK Interactive. It demonstrates that, in the past few years, the number of albums released by DistroKid has grown exponentially in comparison to the number of albums released by other distributors—and even in comparison to the number of DistroKid's own album releases just one year ago. The evidence of DistroKid distributing mass-generated AI spam with the aim of siphoning revenue from the legitimate economy is obvious:




**Figure 3**: Digital Service – Graph Charting the Number of Weekly Releases By Distributor From 2016-2026 (Redacted).

In addition, DistroKid now accounts for *more than 50%* of all weekly track releases on one major Digital Service. Indeed, in the past six months, DistroKid distributed nearly *twelve million tracks* total to that same Digital Service—over half of all tracks delivered to the Service and more than all other distributors combined.

61. As another example, Plaintiffs' investigation has found that DistroKid-distributed recordings also reflect instances of "ISRC theft," in which tracks are uploaded with the same ISRC as legitimate tracks by UMG artists. Even where the recording itself does not include infringing sounds, it improperly uses metadata from the legitimate track—i.e., the same ISRC and/or a song title that references the legitimate artist or track title. For example, a DistroKid-distributed song

titled "Juice Newton" by an "artist" named "Candy DuIfer"[24] bears the same ISRC as "Angel of the Morning" by Juice Newton. Doing so creates conflicting ownership claims, diverting streaming traffic to the improper track rather than the legitimate recording and providing DistroKid with access to consumption and revenue data about the legitimate recording. Even after being disputed, DistroKid did not remove the track from the Digital Service, meaning all revenue generated by the legitimate track on that Service is currently frozen because DistroKid has refused to disclaim ownership, despite UMG's requests that it do so.

62. Further, even though it has access to information regarding likely bad actors, DistroKid serves as a hub for "artists" that have been banned by other distributors due to repeated violations of the Digital Services' policies, including copyright infringement and streaming fraud. Specifically, as an MFFA member, DistroKid has access to an MFFA database, which identifies tracks that have been delisted by distributors and/or the Digital Services and the reason why those tracks were delisted. Certain artists that have been banned by other open-access distributors have *hundreds* of flags in the MFFA database. Yet, DistroKid has welcomed many of those same bad actors as account holders and even distributed tracks bearing the very same ISRCs that have been flagged by their prior distributors.

63. For example, the DistroKid account holder, Lounge Ibiza Cafè, previously distributed tracks through a different open-access distributor, but was banned from that service after the distributor became aware that Lounge Ibiza Cafè was engaging in streaming fraud. When the distributor offboarded Lounge Ibiza Cafè in April 2026, it ensured other distributors had information regarding that artist's fraudulent conduct by flagging *196 of Lounge Ibiza Cafè's*

[24] The artist's name appears to be spelled with an uppercase "I" in an attempt to confuse listeners searching for the legitimate artist, Candy Dulfer, spelled with a lowercase "l".

*tracks* for "streaming fraud" in the MFFA database. Yet, in June 2026, DistroKid distributed Lounge Ibiza Cafè tracks bearing the same flagged ISRCs to the Digital Services. DistroKid's actions are not consistent with the image it presents publicly. The MFFA database exists so MFFA members can use it to prevent bad actors from engaging in streaming fraud. Yet DistroKid either declined to engage in that review, or it saw Lounge Ibiza Cafè's history of fraud and chose to distribute for that account holder anyway.

64. Finally, as alleged further below, DistroKid continues to represent that specific infringing recordings are non-infringing and compliant with the Digital Services' policies *after* receiving track-by-track conflict notices through certain Digital Services' rights-management systems, and *after* confirming DistroKid does not have rights that it can verify and assert in those very recordings. Each continued delivery of such a recording to another Digital Service repeats the false representation that DistroKid has rights in a track it has already conceded it has no rights to distribute.

65. DistroKid's decision to prioritize volume at all costs benefits it, regardless of whether many of the tracks that it distributes are infringing copies or AI-generated slop. Each account holder pays DistroKid a monthly subscription fee; each track distributed by DistroKid is a potential source of revenue for that account holder and, thus, an incentive to continue paying for a DistroKid subscription. Each track is also a potential revenue source for DistroKid and its investors. While DistroKid's current model allows unlimited uploads as a strategy to gain users and volume, it can switch to a revenue-share or other financial model when it decides that doing so will make DistroKid and its investors more money. And, even under the existing model, each account holder and track translates to higher subscription revenues and market share, thereby increasing DistroKid's valuation and attractiveness to investors.

## III. <u>DistroKid's Knowing And Willful Infringement Of Plaintiffs' Sound Recordings</u>

66. To achieve its massive volume of account holders and sound recordings, DistroKid has also run roughshod over the rights of copyright holders like Plaintiffs whose sound recordings are being copied, distributed, and publicly performed, in whole or in part, by DistroKid without authorization.

### A. Plaintiffs Have Identified Many Examples Of Infringement, And Discovery Will Uncover More.

67. DistroKid has copied and distributed to the Digital Services thousands of recordings that infringe copyright or exclusive rights in Plaintiffs' sound recordings, including infringing copies of some of the most popular and valuable recordings in the world. Plaintiffs' investigation to date has identified nearly 2,000 infringing DistroKid-distributed recordings.

68. DistroKid copies and distributes tracks that include cover art that makes the unauthorized distribution obvious. Here is yet another example, featuring Plaintiffs' copyrighted sound recording "Impossible" by Shontelle and its cover art, with a DistroKid-distributed track looking nearly identical:




**Figure 4A**: Copyrighted UMG Sound Recording,
Spotify, Impossible by Shontelle,
https://open.spotify.com/album/53paXYBDcvlAdTpL4blAPg (last visited Sept. 14, 2026).




**Figure 4B**: Infringing DistroKid Sound Recording,
Spotify, Impossible – Shontelle (SIIDZ Remix) by SIIDZ,
https://open.spotify.com/album/1DPTNQJujTZXL0hf5j6i99 (last visited Sept. 14, 2026).

69. Yet others of DistroKid's infringing sound recordings are long compilations of music that feature multiple infringing tracks combined together. For example, a DistroKid-distributed mix, "Dance Rock Mix, Vol. 1" is over two hours long and features extended clips of two of Plaintiffs' hit recordings, "MMMBop" by Hanson and "One Of Us" by Joan Osborne. Another DistroKid-distributed mix, "Friday Night Vibes Vol 2. || Jersey Club, 00's, & Reggae," is roughly 40 minutes long and features samples of numerous popular sound recordings, including Plaintiffs' recordings, "Always On Time" by Ja Rule and "Ms. New Booty" by Bubba Sparxxx.

70. **Exhibits A** and **B** identify *1,000* examples of sound recordings that are owned or exclusively licensed by Plaintiffs and have been infringed by tracks distributed by DistroKid. Plaintiffs identified each of these infringements using one or more of the Digital Services' rights-management tools (e.g., YouTube's advanced ContentID system), which analyzed each DistroKid-distributed recording and determined that it copies (in whole or in part) one of Plaintiffs' sound recordings. Plaintiffs then verified the infringement by comparing the audio files manually and/or through another industry-leading content-identification tool, Pex.

71. The infringements Plaintiffs have identified to date are necessarily limited to those visible to them. There are surely others. Plaintiffs' visibility into rights conflicts is limited to those Digital Services that operate copyright-management systems in which DistroKid participates. Discovery will reveal more.

### B. DistroKid *Continues* To Distribute These Infringing Tracks *Even After* A Digital Service Identifies Them As Infringing.

72. DistroKid cannot credibly deny it has knowledge of the substantial infringement in the tracks it copies and distributes, and from which it benefits. DistroKid receives, reviews, and acts upon specific, track-by-track notifications when copies of sound recordings it distributes conflict with Plaintiffs' rights (and presumably other rightsholders) through certain Digital Services' copyright-management systems.

73. When DistroKid registers recordings in the copyright-management and monetization systems of YouTube or uploads recordings to Meta's and TikTok's rights manager systems, the Digital Services employ audio fingerprinting. When DistroKid distributes a recording that matches a recording in which Plaintiffs have asserted rights, the system generates a conflict or "reference overlap" that is communicated to both parties.




**Figure 5**: Screen capture of a reference overlap in YouTube's ContentID system (red box added)

74. This conflict resolution process is not automatic. DistroKid participates. A DistroKid employee logs in, reviews the conflicting claims, and affirmatively elects whether to maintain or relinquish DistroKid's asserted rights. For example, when a reference overlap surfaces in YouTube's ContentID system (Figure 5), YouTube prompts DistroKid to answer the question: "Do you have exclusive rights to the [identified conflicting rights] in your territories?" DistroKid may click one button to answer "Yes, assert ownership" over the conflicting track on behalf of DistroKid's account holder, or a different button to answer "No, exclude overlaps," thereby conceding that the account holder has no rights to the track. Alternatively, DistroKid may allow the conflict report to expire; when that happens, the track will be excluded from the Digital Service's offering and treated in the same manner as if DistroKid clicked the "No" button.

75. DistroKid personnel necessarily review such conflicts (or make a conscious decision not to do so). During that review, they see the conflict between DistroKid's and Plaintiffs' sound recordings, and they often, though not always, affirmatively relinquish any claim of rights to the recording that DistroKid has distributed. In other words, DistroKid concedes that it distributed an infringing track.

76. In each case involving a conflict resolved in Plaintiffs' favor, the Digital Service gives notice of that resolution to DistroKid. The resolution notice gives DistroKid specific, recording-level knowledge that a track DistroKid has distributed infringes Plaintiffs' rights.

77. DistroKid does not remove that same recording (the same track, bearing the same ISRC, delivered by DistroKid through its own commercial feeds) from *other* Digital Services. The majority of Digital Services do not have rights management tools, so they do not know that DistroKid is continuing to distribute the infringing track. The infringing track simply remains live, generating revenue on every other Digital Service that has not issued a conflict.

78. This appears to be a deliberate strategy to prioritize its ongoing financial relationships with account holders over compliance with copyright law. The conflicts identified by the copyright-management system give DistroKid notice of infringement and then the obligation to act on that notice. Once DistroKid affirmatively relinquishes its claim of rights, either by acknowledging that it does not have rights in the sound recording, or by declining to respond (which has the same effect), it should *stop* distributing that track across *all* Digital Services, not just the one on which it got caught. But DistroKid does not do that. Instead, in the lion's share of cases, DistroKid *continues* to distribute these sound recordings to other services, and continues to collect revenue for its account holders.

**C. DistroKid Profits Directly From The Infringing Tracks It Distributes.**

79. DistroKid's profit, and attractiveness to investors, grows with its volume.

80. First, DistroKid's current subscription-revenue-based model depends on the recruitment and retention of paying account holders. Infringers see obvious advantages to subscribing to DistroKid: DistroKid's lightning-fast distribution of unlimited tracks and its lax approach to copyright and AI spam make it an attractive distributor for account holders trying to make money off infringing Plaintiffs' recordings.

81. Second, DistroKid's attractiveness to investors is directly tied to its volume. Investors see millions of tracks that they can then monetize in ways *other than* a monthly subscription. Like every other company that aims to grow to scale, DistroKid will shift (and has already started to do so) to a percentage-of-revenue model (in which Distrokid retains a percentage of the revenue generated by a track), and greatly increase its monetization.

82. Third, DistroKid has a growing number of revenue streams that are on a per-track basis. For example, for $0.99/track, DistroKid offers to add an account holder's track to "discovery-based platforms," such as Gracenote, which enable the track title and artist name to be

recognized by smart automobiles, video services, and more.[25] For $26.99/track, DistroKid offers to evaluate whether an account holder's track has been properly mixed in Dolby Atmos's spatial audio format and, if so, designate the track as available for spatial audio listening on supported devices and streaming services, such as Apple Music and Tidal.[26] And for $29/track, DistroKid account holders can pay for a "Leave a Legacy" add-on, which prevents DistroKid from removing the track from Digital Services in the event that the account holder's DistroKid subscription lapses.[27]

83. Fourth, DistroKid has already shifted some of its monetization strategy to a percentage-of-revenue model, tied directly to the exploitation of the recordings it distributes. Through the "Social Media Pack" offering, DistroKid distributes recordings into the UGC-claiming monetization systems of YouTube, Meta, TikTok, Spotify and others. In exchange, DistroKid retains 20% of the resulting revenue.

84. Fifth, DistroKid profits from the continued exploitation of recordings it knows to be infringing, at the expense of the copyright holders such as Plaintiffs. As described above, when a Digital Service's rights management tool flags an infringing track, DistroKid continues to distribute the identical recording to the other Digital Services. DistroKid disregards the knowledge that specific tracks it distributes are infringing. Plaintiffs' investigation has revealed numerous tracks that were removed due to a rights-management tool on one platform, but remain online on others. To name just a few examples, the following DistroKid-distributed tracks were removed

---

[25] DistroKid Help Center, What Are Album Extras?, https://support.distrokid.com/hc/en-us/articles/360013534274-What-Are-Album-Extras [https://perma.cc/QUN5-93E2] (last visited Sept. 14, 2026).

[26] *Id.*

[27] *Id.*

from TikTok and/or YouTube due to rights conflicts with Plaintiffs' works, but remained on Spotify and/or Apple Music at the time of filing:

| DistroKid Track |
| --- |
| "Buy Me Presents" by Jessica Da Silva |
| "Hypnotized" by Bri Hazyy |
| "IT GIRL Freestyle" by Lolo Renny |
| "Mystery" by David Diaveli |
| "Slow Money" by Illori Vice |

85. Finally, as alleged in more detail below, DistroKid monitors the performance of the tracks it distributes, extends preferential treatment to selected accounts, with a goal of that preferential treatment benefiting both the account holder, and, in turn, DistroKid.

## IV. DistroKid Competes With Plaintiffs And Other Legitimate Distributors Of Sound Recordings, Just On Unfair Terms

86. DistroKid's deceptive and infringing distribution tactics are especially harmful to Plaintiffs because, as a commercial distributor of music, DistroKid directly competes with Plaintiffs and other recorded music companies that are also in the business of music distribution. Like its competitors, DistroKid ingests, copies, and delivers sound recordings to the Digital Services under negotiated agreements, and it likewise offers promotional and other support services. But DistroKid does so at an unfair competitive advantage.

**A. DistroKid's Distribution Services**

87. DistroKid's account holders pay a monthly or annual subscription fee at one of three tiers of service, corresponding to different options and benefits.[28] At every tier, DistroKid promises to ingest, copy, and distribute an unlimited number of sound recordings to one or more of the 150+ Digital Services, including "Spotify, Apple Music, TikTok, Pandora, Amazon, Instagram, YouTube, Tidal, iHeartRadio, Deezer, plus a ton of other stores & streaming services."[29]

88. DistroKid distributes the sound recordings that it copies pursuant to negotiated arrangements with each of the Digital Services. DistroKid's executives and employees negotiate these agreements and maintain ongoing commercial relationships with the Digital Services. These relationships involve frequent communication, as well as information and data-sharing regarding the recordings that DistroKid distributes.

89. Plaintiffs know about DistroKid's distribution process because they *too* negotiate distribution agreements with the same services. DistroKid's agreements necessarily include standard industry terms such as the following: (a) DistroKid has dedicated commercial distribution feeds to each Digital Service for supplying the sound recordings and bypassing those services' typical interface for submission (if they have one accessible to consumers); (b) DistroKid represents and warrants to the Digital Service that it holds the rights necessary to distribute and license the recordings it delivers; and (c) the Digital Service pays DistroKid for the exploitation of

---

[28] DistroKid, DistroKid Plans and Pricing, https://distrokid.com/pricing/ [https://perma.cc/7AR4-VWM5] (last visited Sept. 14, 2026).

[29] DistroKid: Music Distribution Services, https://distrokid.com/ [https://perma.cc/N2P9-PBD7] (last visited Sept. 14, 2026).

those recordings, on payment terms negotiated between DistroKid and the Digital Services.[30] These are agreements negotiated and implemented by DistroKid's employees.

90. Notably, the DistroKid account holders are not parties to these agreements. The Digital Services' payments flow to *DistroKid*. DistroKid has entirely separate relationships with its account holders, which are governed by terms in user agreements and policies that are posted on DistroKid's website. In accordance with those terms, DistroKid decides what funds to remit, and when, to each account holder, through a DistroKid Bank account that DistroKid manages. DistroKid may remit some, all, or none of particular revenue streams depending on the product involved. For example, DistroKid retains 20% of the revenue generated through its "Social Media Pack" monetization offering, and it charges account holders separate fees to keep their own recordings live on the Digital Services after ending their subscription with DistroKid.[31] DistroKid also imposes a minimum payout threshold before allowing an account holder to withdraw earnings.[32]

91. DistroKid, not its account holders, performs the operational work of getting recordings onto the Digital Services. Although faster than other distributors, DistroKid nevertheless tells its account holders that "[i]t can take several days for albums to be reviewed, approved, and sent to streaming services," in addition to the time the Digital Services take to ingest

[30] Although Plaintiffs do not have access to DistroKid's agreements with the Digital Services, the basic terms of such agreements are largely the same across distributors and are no secret in the music industry. In particular, the agreements *must* include a representation by DistroKid that it has the necessary rights to distribute all the content it delivers.

[31] DistroKid Help Center, How Much of My Earnings Does DistroKid Keep?, https://support.distrokid.com/hc/en-us/articles/360013649253-How-Much-of-My-Earnings-Does-DistroKid-Keep [https://perma.cc/L5EP-5UX9] (last visited Sept. 14, 2026).

[32] DistroKid Help Center, Is There a Minimum Payout Threshold?, https://support.distrokid.com/hc/en-us/articles/360013648353-Is-There-a-Minimum-Payout-Threshold [https://perma.cc/QZ8H-ESAG] (last visited Sept. 14, 2026).

the release.[33] DistroKid's own hiring history reflects the human operation of its distribution. DistroKid employs Content Operations Specialists whose duties include performing "manual" content-delivery and content-management tasks—expressly including administration of YouTube's Content ID system—and coordinating directly with the Digital Services regarding the delivery of recordings.[34]

92. DistroKid personnel also handle contested rejections of uploaded content and related communications with both the Digital Services and the account holders. DistroKid instructs its account holders that "[d]etails on the rejection will be included in the email you received. If you think your release was rejected in error, just reply to that email for more information."[35] One expects that those replies are reviewed and resolved by DistroKid employees. If track-rejection disputes resolve favorably for the account holder, the track is then distributed to the Digital Services and can earn revenue.

93. Online reporting also suggests that DistroKid maintains an internal system that tags certain accounts for preferential treatment, in the form of expedited distribution, based on the discretion of DistroKid administrators.[36] These decisions reflect individualized, human decision-

---

[33] DistroKid Help Center, How Long Does It Take for My Music to Be Available in Streaming Services?, https://support.distrokid.com/hc/en-us/articles/360013649293-How-Long-Does-It-Take-for-My-Music-to-Be-Available-in-Streaming-Services [https://perma.cc/UGP6-ACZU] (last visited Sept. 14, 2026).

[34] TriNet Group, Inc., Jobs at DistroKid, Content Operations Specialist, https://app.trinethire.com/companies/26766-distrokid/jobs/65991-content-operations-specialist (last visited Sept. 14, 2026).

[35] DistroKid Help Center, Handling a Rejected DistroKid Release, https://support.distrokid.com/hc/en-us/articles/10405555881619-Handling-a-Rejected-DistroKid-Release [https://perma.cc/SUG5-J52U] (last visited Sept. 14, 2026).

[36] Posted by u/jasensamford, Reddit (r/DistroKidHelpDesk), *Former DistroKid Employee, Happy to Help With Account, Takedown, and Held Earnings Issues* (2026), https://www.reddit.com/r/DistroKidHelpDesk/comments/1u8k2hd/former_distrokid_employee_happy_to_help_with/.

making by DistroKid personnel about whose content is delivered to the Digital Services, and how quickly.

### B. DistroKid's Record Label Services

94. DistroKid does not limit its services to distribution. It includes a set of promotional and monetization features, through which DistroKid promises to fill the very same role in the music ecosystem as full-fledged recorded music companies like Plaintiffs. One of DistroKid's online testimonials confirms this point, describing DistroKid as "[a] million dollar record label for $20."

95. DistroKid provides a "HyperFollow" promotional webpage, a "completely free (and awesomely powerful) promotional tool."[37] As part of this service, DistroKid "automatically create[s]" additional copies of the sound recordings and promotional materials for *every* release.[38] DistroKid then maintains and displays these assets on a promotional webpage (created and controlled by DistroKid), which markets the release of the sound recording on the Digital Services. Visitors to a HyperFollow page can stream and listen to at least a portion of the sound recording, which is transmitted to the visitor by DistroKid and from DistroKid's servers. DistroKid uses these pages to obtain fan data, both for itself and to share with its account holders, including "city-level geographic location" of those who are listening, and "other music that [those] fans are listening to."[39]

[37] DistroKid Help Center, What Is HyperFollow?, https://support.distrokid.com/hc/en-us/articles/360013647913-What-Is-HyperFollow [https://perma.cc/Y245-M653] (last visited Sept. 14, 2026).

[38] *Id.*

[39] *Id.*

96. DistroKid also offers "add-on" label-style creative, promotional, and merchandising services that its account holders can purchase separately. Each of these services generates further copies of the sound recordings. DistroKid's "Mixea" is its online mastering service, i.e., the creation of new, altered master copies.[40] DistroKid's "Vizy" is a video generator to create promotional and music videos. "DistroVid" is a related distribution service for music videos.[41]

97. DistroKid's highest-level subscription tier includes a suite of services around playlist placement, including the opportunity to "pitch music for playlist consideration" by Spotify's editorial curators and to access contact information for other prominent playlist curators.

98. These offerings are not novel. They are the same functions that record companies have always performed for their artists and DistroKid is offering them for the same fundamental reason—to boost the popularity of its "artists" and monetize their work, which ultimately benefits DistroKid. Record companies master recordings; DistroKid offers "Mixea." Record companies produce and distribute music videos; DistroKid offers "Vizy" and "DistroVid." Record companies manufacture and sell artist merchandise; DistroKid offers "Direct," which does the same thing. Record companies promote their artists' releases, pitch them for placement, and cultivate relationships with the outlets that drive music discovery; DistroKid does the same type of promotion through "HyperFollow," "Playlister," "Playlist Spotlight," and its own branded playlists. DistroKid also cultivates and tracks music consumption data because it is just as

[40] DistroKid Help Center, Mixea, https://support.distrokid.com/hc/en-us/sections/4408242821523-Mixea [https://perma.cc/K4Y6-JMX7] (last visited Sept. 14, 2026).

[41] DistroKid Help Center, DistroKid Goodies: Beyond Distribution, https://support.distrokid.com/hc/en-us/articles/4712724929427-DistroKid-Goodies-Beyond-Distribution [https://perma.cc/RN3Y-L68M] (last visited Sept. 14, 2026); DistroVid, Music Video Distribution | DistroVid Powered by DistroKid, https://distrovid.com/ [https://perma.cc/76SM-QPLU] (last visited Sept. 14, 2026).

interested in which of its "artists" are catching on as any record label would be, and it can then look for ways to monetize and capitalize on that information. The DistroKid employees who run these functions are performing the same work that record company personnel perform for their labels' artists. The difference is not what DistroKid does—it is that DistroKid does it for any paying account holder, for any recording they upload, with no regard for whether the "artist" it is servicing is a real human or actually created or owns the music.

## V. DistroKid's Deceptive and Infringing Conduct Harms Plaintiffs, Artists, And Consumers

99. DistroKid's unlawful conduct harms the gamut of players in the music industry—including Plaintiffs and their artists, the Digital Services, and consumers who seek access to high-quality, legitimate sound recordings by real human artists.

100. DistroKid's widely distributed infringing recordings and mass-generated AI tracks compete alongside Plaintiffs' legitimate recordings for listeners. The sheer volume of, and manipulative tactics (SEO hacking, ISRC theft, copied artwork, algorithm hacking, etc.) used by, DistroKid's tracks crowd out Plaintiffs' recordings in the market. When a listener selects a DistroKid track instead of Plaintiffs' authorized recording—including because the track uses the same or a confusingly similar title, artist attribution, metadata, or cover art—DistroKid and its account holder receive the stream and its associated economic benefit, while Plaintiffs and their artists lose what they would have received if the listener had picked the legitimate recording.

101. Respect for legitimate, human artists and for copyright is critical to the lawful creation and distribution of sound recordings. Plaintiffs invest substantial resources into the creation of sound recordings, and Plaintiffs recover their investment through the authorized distribution of those sound recordings. The revenue also supports the discovery, development, and promotion of other artists and their creation of new sound recordings. DistroKid misleadingly

represents that it operates as a similarly legitimate distributor while avoiding the corresponding costs and safeguards. Meanwhile, DistroKid's unlawful practices force Plaintiffs to incur substantial additional costs identifying infringing recordings, investigating fraudulent activity, submitting claims through the Digital Services' rights-management systems, seeking removal of unauthorized content, and protecting the integrity of Plaintiffs' catalogs. DistroKid has thus enhanced its own market position with unfair, deceptive, and illegal conduct at the expense of competitors that bear the cost of responsible distribution.

102. Plaintiffs' artists and royalty recipients suffer corresponding harm. Artists depend on listeners' finite time and attention to earn royalties, build audiences, and sustain their careers. Infringing and mass-generated tracks distributed by DistroKid crowd legitimate artists out of the channels through which listeners discover music—including search results, playlists, and recommendation systems. Each diverted stream deprives a genuine artist of revenue, visibility, audience data, and an opportunity to develop a lasting relationship with a listener. At scale, DistroKid's conduct makes it more difficult for working and emerging artists to be discovered and compensated for their creative labor.

103. Moreover, DistroKid's infringing conduct deprives Plaintiffs and their artists of creative control over the modification and adaptation of their sound recordings—uses that, under copyright law, are subject to their consent. For example, DistroKid distributes significant numbers of tracks that are "sped up," "slowed," and "remixed" versions of Plaintiffs' recordings, as well as tracks that sample or copy instrumentals from Plaintiffs' recordings. Plaintiffs, however, have the exclusive right to modify or adapt copies of the sound recordings they own. The widespread distribution of modified versions of Plaintiffs' sound recordings sows confusion as to the attribution of specific works, causing Plaintiffs further irreparable harm.

104. DistroKid also harms music consumers—including consumers in Delaware. Listeners reasonably expect that recordings offered through established Digital Services are legitimate artist-backed releases, rather than bot-generated AI slop created only for revenue generation. Consumers are thus misled to think that every track they find on these Digital Services is an artist-backed release, when much of what DistroKid distributes is not. DistroKid's deceptive and infringing practices make it more and more difficult for listeners to connect with real artists.

105. The music industry depends on the legitimate businesses involved working to protect the creativity of artists from infringement. DistroKid serves as the counterexample—having grown to its claimed size and market share in distribution by prioritizing speed at the cost of rights verification, prevention of copyright infringement, and adherence to the other important policies that protect the music ecosystem.

## CAUSES OF ACTION

### Count One – Delaware Deceptive Trade Practices Act

### 6 Del. C. § 2531 *et seq.*

106. Plaintiffs reallege every allegation contained in all prior paragraphs of this Complaint as if fully set forth herein.

107. DistroKid has engaged and continues to engage in deceptive trade practices within the meaning of 6 Del. C. § 2532(a), including § 2532(a)(5), (a)(7), and (a)(12). Through its public statements, agreements, and participation in the Music Fights Fraud Alliance, DistroKid represents to the market, including artists, the Digital Services, and consumers, that the sound recordings it distributes have specific "characteristics," as well as a particular "standard" and "quality": that they are original, authorized artist-backed releases, and that the recordings comply with the Digital Services' policies against the distribution of AI slop and that all rights have been cleared for commercial exploitation.

108. On information and belief, tens of thousands, hundreds of thousands, millions, and possibly more of the recordings distributed by DistroKid are purely AI content uploaded by anonymous account holders seeking to exploit Plaintiffs, other legitimate record companies and distributors, and consumers, by generating as many streams as possible through spam tactics such as mass uploads and search engine optimization hacks. And many other recordings are unauthorized copies of Plaintiffs' copyrighted sound recordings (or those of other rightsholders). DistroKid knows this, including because it receives notice of rights conflicts from some Digital Services, but nevertheless continues to distribute those sound recordings to other Digital Services.

109. The Digital Services, many of which are incorporated in Delaware, agree to distribute DistroKid's tracks because they (incorrectly) believe that DistroKid vets its account holders to ensure that real human musicians are creating the music, rather than AI content farms and other bad actors that are just looking to make a quick buck by impersonating or copying from real artists. The Digital Services also (incorrectly) believe that the recordings DistroKid distributes are reviewed and rights-cleared, just as is required by all commercial music distributors, including Plaintiffs.

110. Delaware consumers who access music through the Digital Services are also misled. These consumers reasonably expect that the recordings offered through the Digital Services are legitimate artist-backed releases, rather than bot-generated AI slop or infringing tracks created only for revenue generation. But DistroKid has flooded the market with sound recordings that do not meet these standards—misleading Delaware consumers into believing they are engaging with real artists when they, in fact, are being duped by AI bot farms.

111. DistroKid's false representations competitively harm Plaintiffs (two of which are incorporated in Delaware), which work with real, human artists and distribute artist-backed

releases. The result is an ongoing, unlawful competitive advantage to DistroKid, which invests little to nothing in ensuring its sound recordings are authorized and legitimate; and a competitive disadvantage to Plaintiffs, which invest substantially in the legitimate music market. Yet the recordings of DistroKid and Plaintiffs then compete (on unequal terms) in the market for listener attention and compensation by the Digital Services. DistroKid diverts listeners from non-infringing tracks, appropriates listener engagement in favor of mass-generated AI tracks, and deprives Plaintiffs and their artists of that listener engagement and corresponding compensation for exploitation of their sound recordings.

112. DistroKid's deceptive conduct correspondingly harms Delaware artists. Delaware artists who choose DistroKid to distribute their music are misled to believe their music distributor is acting in their interest and safeguarding the recorded music pipeline from AI slop and bad actors looking to siphon revenue and listener attention from real human artists. Those artists depend on listener streams and downloads to connect with listeners and build a fan base, and earn revenue that helps sustain their careers. The infringing and mass-generated tracks distributed by DistroKid crowd legitimate artists out of the channels through which listeners discover music, depriving real, human artists of these opportunities to build relationships with listeners, gain visibility, and earn money. In short, DistroKid's conduct makes it more difficult for artists to be discovered and compensated for their creative labor.

113. DistroKid's deceptive trade practices are willful. DistroKid makes its public "artists first" representations to the market, and representations that it subscribes to the MFFA mission and Digital Services' policies regarding no mass-generated or infringing content--knowing full well that its actual business does not comply with these public statements. In particular, it continues to make representations regarding the authorization of specific recordings

even after receiving recording-level conflict notices through the Digital Services' rights-management systems and after indicating that it does not have rights to assert in those very recordings.

114. DistroKid's deceptive trade practices are ongoing. Plaintiffs and their artists are likely to be damaged, and have been damaged, by these practices, including through the diversion of streams, downloads, playlist placements, and associated revenue from Plaintiffs' authorized recordings to unauthorized recordings delivered under color of DistroKid's misrepresentations, and through the erosion of the verified-distribution standard on which the legitimate market depends. Plaintiffs, who include Delaware-based entities, suffer and will suffer these competitive injuries to their businesses in Delaware. On information and belief, DistroKid chooses to target distribution of its tracks to consumers in Delaware by intentionally electing to distribute those tracks in the state.

115. Plaintiffs are entitled to injunctive relief pursuant to 6 Del. C. § 2533(a) and to their reasonable attorneys' fees pursuant to 6 Del. C. § 2533(b) in light of DistroKid's willful conduct.

**Count Two – Direct Copyright Infringement**

**17 U.S.C. § 501**

116. Plaintiffs reallege every allegation contained in all prior paragraphs of this Complaint as if fully set forth herein.

117. DistroKid, without authorization or consent from Plaintiffs, reproduces, publicly performs, and distributes copies of Plaintiffs' sound recordings, including but not limited to those copyrighted sound recordings listed in **Exhibit A** hereto. Such reproduction, public performance, and distribution violate Plaintiffs' exclusive rights under copyright in violation of 17 U.S.C. § 106(1), (3), and (6).

118. Without limitation, these infringements occur when DistroKid "ingests" and reproduces infringing audio recordings on its systems, when it makes further copies of those audio recordings by converting and reformatting them to meet the specifications of the Digital Services, when it distributes those copies to the Digital Services through its dedicated commercial feeds, when it makes copies of the recordings for HyperFollow pages hosted by DistroKid, and when it publicly performs those recordings from the HyperFollow pages—all without license or authority from Plaintiffs.

119. Each unauthorized reproduction, distribution, and public performance of each of Plaintiffs' copyrighted sound recordings constitutes a separate and distinct act of infringement.

120. DistroKid has deliberately and intentionally designed its distribution system. DistroKid's employees negotiate and maintain the commercial relationships with each Digital Service. DistroKid employees play a direct role in the copying and distribution, including by resolving contested rejections of sound recordings; determining whose content is delivered and how quickly; addressing conflicts and rights in the rights-management systems of certain Digital Services on a track-by-track basis; and collecting and remitting the resulting revenue.

121. DistroKid's acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs. Among other things, DistroKid has continued to reproduce, publicly perform, and distribute tracks to the Digital Services after acknowledging, through the rights-management systems of other Digital Services, that its account holders do not have the relevant rights in the recordings those tracks embody.

122. As a direct and proximate result of DistroKid's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work

infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and DistroKid's profits from infringement, in amounts to be proven at trial.

123. Plaintiffs are entitled to their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

124. Plaintiffs are entitled to an order for the impounding and destruction of all infringing copies of Plaintiffs' works.

125. DistroKid's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to an injunction prohibiting the infringement of Plaintiffs' copyrights and exclusive rights under copyright.

**Count Three – Vicarious Copyright Infringement**

**17 U.S.C. § 501 (Alternative to Direct Infringement)**

126. Plaintiffs reallege every allegation contained in all prior paragraphs of this Complaint as if fully set forth herein.

127. Account holders in DistroKid's supply chain are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce and distribute Plaintiffs' copyrighted sound recordings, including but not limited to those copyrighted sound recordings listed in **Exhibit A** hereto, when they reproduce those recordings and deliver tracks embodying them to DistroKid for commercial distribution to the Digital Services. In addition, the copyrights in Plaintiffs' sound recordings are infringed when the Digital Services to which DistroKid has delivered Plaintiffs' sound recordings reproduce, publicly perform, and further distribute those recordings under color of the rights purportedly conveyed through DistroKid.

128. To the extent that DistroKid is not itself legally responsible for the reproductions, distributions, and public performances of the infringing tracks it distributes to the Digital Services, DistroKid is vicariously liable for these infringing acts.

129. DistroKid has the legal right and practical ability to supervise and control the infringing activities of its account holders and the distribution pipeline to the Digital Services, through which it delivers infringing tracks, including, among other things, because:

a. the infringing tracks are ingested onto and physically present on DistroKid's systems before DistroKid reproduces and delivers them to the Digital Services, giving DistroKid the right and ability to review, filter (including with the audio fingerprinting technology and other readily available tools), and then decline to distribute the infringing tracks;

b. DistroKid demonstrably exercises control over the continued availability of every track it distributes by removing (or for a fee maintaining) recordings from the Digital Services when an account holder's subscription lapses, and it excludes or relinquishes tracks in the rights-management systems of certain Digital Services when conflicts are resolved against its account holders;

c. DistroKid receives, reviews, and resolves track-by-track rights conflicts through the rights-management systems of certain Digital Services, including YouTube, Meta, and TikTok, giving it the practical ability to identify infringing tracks and infringing account holders and to take action against them across all of the Digital Services to which it distributes; and

d. DistroKid reserves the right to decline to distribute, or to remove from the Digital Services, any recording for any reason, including "if we receive any legal claims

regarding the particular Recording(s), if we reasonably believe that any legal claims or issues may arise, if a Recording may violate the terms and conditions of any Digital Store, or for any other reason in our business judgment," and to terminate the accounts of account holders engaged in infringement.

130. DistroKid at all relevant times has derived a direct financial benefit attributable to the infringement of Plaintiffs' copyrighted sound recordings by its account holders and the Digital Services to which it delivers infringing tracks. Among other things: the availability of fast, unlimited, no-questions-asked distribution of content is a draw for would-be infringing subscribers. DistroKid also collects per-track and per-upload fees that scale with the volume it distributes. Through the Social Media Pack, DistroKid retains 20% of the revenue generated when recordings earn revenue on certain monetized social media content, including to the extent any are infringing copies. In short, DistroKid earns more and benefits more from every additional account holder and track, including those that are infringing.

131. Each unauthorized reproduction, distribution, and public performance of each of Plaintiffs' copyrighted sound recordings constitutes a separate and distinct act of infringement.

132. DistroKid's acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs. Among other things, DistroKid has continued to reproduce, publicly perform, and distribute tracks to the Digital Services after acknowledging, through the rights-management systems of other Digital Services, that its account holders do not have the relevant rights in the recordings those tracks embody.

133. As a direct and proximate result of DistroKid's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work

infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and DistroKid's profits from infringement, in amounts to be proven at trial.

134. Plaintiffs are entitled to their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

135. Plaintiffs are entitled to an order for the impounding and destruction of all infringing copies of Plaintiffs' works.

136. DistroKid's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to an injunction prohibiting the infringement of Plaintiffs' copyrights and exclusive rights under copyright.

**Count Four – Direct Infringement of Pre-1972 Sound Recordings**

**17 U.S.C. § 1401**

137. Plaintiffs reallege every allegation contained in all prior paragraphs of this Complaint as if fully set forth herein.

138. DistroKid, without authorization or consent from Plaintiffs, reproduces and distributes copies of Plaintiffs' protected pre-1972 sound recordings, including but not limited to those sound recordings listed in **Exhibit B** hereto. Such reproduction, public performance, and distribution violates Plaintiffs' rights in their protected pre-1972 sound recordings and exclusive rights under 17 U.S.C. § 1401(a)(1).

139. Without limitation, these infringements occur when DistroKid "ingests" and reproduces infringing audio recordings on its systems, when it makes further copies of those audio recordings by converting and reformatting them to meet the specifications of the Digital Services,

when it distributes those copies to the Digital Services through its dedicated commercial feeds, when it makes copies of the recordings for HyperFollow pages hosted by DistroKid, and when it publicly performs those recordings from the HyperFollow pages—all without license or authority from Plaintiffs.

140. Each unauthorized reproduction, distribution, and public performance of each of Plaintiffs' protected pre-1972 sound recordings constitutes a separate and distinct act of infringement.

141. DistroKid has deliberately and intentionally designed its distribution system. DistroKid's employees negotiate and maintain the commercial relationships with each Digital Service. DistroKid employees play a direct role in the copying and distribution, including by resolving contested rejections of sound recordings; determining whose content is delivered and how quickly; addressing conflicts and rights in the rights-management systems of certain Digital Services on a track-by-track basis; and collecting and remitting the resulting revenue.

142. DistroKid's acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs. Among other things, DistroKid has continued to reproduce, publicly perform, and distribute tracks to the Digital Services after acknowledging, through the rights-management systems of other Digital Services, that its account holders do not have the relevant rights in the recordings those tracks embody.

143. As a direct and proximate result of DistroKid's infringement of Plaintiffs' protected pre-1972 sound recordings and exclusive rights under 17 U.S.C. § 1401(a), Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).

In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and DistroKid's profits from infringement, in amounts to be proven at trial.

144. Plaintiffs are entitled to their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

145. Plaintiffs are entitled to an order for the impounding and destruction of all infringing copies of Plaintiffs' protected pre-1972 sound recordings.

146. DistroKid's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to an injunction prohibiting the infringement of Plaintiffs' protected pre-1972 sound recordings, and exclusive rights under 17 U.S.C. § 1401(a).

**Count Five – Vicarious Infringement of Pre-1972 Sound Recordings**

**17 U.S.C. § 1401 (Alternative to Direct Infringement)**

147. Plaintiffs reallege every allegation contained in all prior paragraphs of this Complaint as if fully set forth herein.

148. Account holders in DistroKid's supply chain are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce and distribute Plaintiffs' sound recordings, including but not limited to those protected pre-1972 sound recordings listed in **Exhibit B** hereto, when they reproduce those recordings and deliver tracks embodying them to DistroKid for commercial distribution to the Digital Services. In addition, Plaintiffs' rights in their protected pre-1972 sound recordings are infringed when the Digital Services to which DistroKid has delivered Plaintiffs' sound recordings reproduce, publicly perform, and further distribute those recordings under color of the rights purportedly conveyed through DistroKid.

149. To the extent that DistroKid is not itself legally responsible for the reproductions, distributions, and public performances of the infringing tracks it distributes to the Digital Services, DistroKid is vicariously liable for these infringing acts.

150. DistroKid has the legal right and practical ability to supervise and control the infringing activities of its account holders and the distribution pipeline to the Digital Services, through which it delivers infringing tracks, including, among other things, because:

a. DistroKid reserves the right to decline to distribute, or to remove from the Digital Services, any recording for any reason, including "if we receive any legal claims regarding the particular Recording(s), if we reasonably believe that any legal claims or issues may arise, if a Recording may violate the terms and conditions of any Digital Store, or for any other reason in our business judgment," and to terminate the accounts of account holders engaged in infringement;

b. the infringing tracks are ingested onto and physically present on DistroKid's systems before DistroKid reproduces and delivers them to the Digital Services, giving DistroKid the right and ability to review, filter (including with the audio fingerprinting technology and other readily available tools), and then decline to distribute the infringing tracks;

c. DistroKid demonstrably exercises control over the continued availability of every track it distributes by removing (or for a fee maintaining) recordings from the Digital Services when an account holder's subscription lapses, and it excludes or relinquishes tracks in the rights-management systems of certain Digital Services when conflicts are resolved against its account holders; and

d. DistroKid receives, reviews, and resolves track-by-track rights conflicts through the rights-management systems of certain Digital Services, including YouTube, Meta, and TikTok, giving it the practical ability to identify infringing tracks and infringing account holders and to take action against them across all of the Digital Services to which it distributes.

151. DistroKid at all relevant times has derived a direct financial benefit attributable to the infringement of Plaintiffs' protected pre-1972 sound recordings by its account holders and the Digital Services to which it delivers infringing tracks. Among other things: the availability of fast, unlimited, no-questions-asked distribution of content is a draw for would-be infringing subscribers. DistroKid also collects per-track and per-upload fees that scale with the volume it distributes. Through the Social Media Pack, DistroKid retains 20% of the revenue generated when recordings earn revenue on certain monetized social media content, including to the extent any are infringing copies. In short, DistroKid earns more and benefits more from every additional account holder and track, including those that are infringing.

152. Each unauthorized reproduction, distribution, and public performance of each of Plaintiffs' protected pre-1972 sound recordings constitutes a separate and distinct act of infringement.

153. DistroKid's acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs. Among other things, DistroKid has continued to reproduce, publicly perform, and distribute tracks to the Digital Services after acknowledging, through the rights-management systems of other Digital Services, that its account holders do not have the relevant rights in the recordings those tracks embody.

154. As a direct and proximate result of DistroKid's infringement of Plaintiffs' protected pre-1972 sound recordings and exclusive rights under 17 U.S.C. § 1401(a), Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and DistroKid's profits from infringement, in amounts to be proven at trial.

155. Plaintiffs are entitled to their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

156. Plaintiffs are entitled to an order for the impounding and destruction of all infringing copies of Plaintiffs' protected pre-1972 sound recordings.

157. DistroKid's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to an injunction prohibiting the infringement of Plaintiffs' protected pre-1972 sound recordings and exclusive rights under 17 U.S.C. § 1401(a).

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, and each of them, as follows:

A. For an injunction pursuant to 6 Del. C. § 2533(a) enjoining Defendants from making public representations or representations to any Digital Service that give the false impression regarding the "characteristics" or the "standard[s]" or "quality" of the sound recordings distributed by Defendants. In particular, enjoining DistroKid from making public representations or representations to Digital Services that give the false impression that the majority of the sound recordings it distributes are artist-backed releases; that it complies with Digital Services and the MFFA's policies and aims of reducing the distribution of misleading mass-generated and manipulative content; and that any recording Defendants distribute is authorized and non-infringing (when they are not).

B. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum per infringed work, arising from DistroKid's violations of Plaintiffs' rights under the Copyright Act and Plaintiffs' exclusive rights under 17 U.S.C. § 1401(a) or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs' actual damages and DistroKid's profits from infringement, in amounts to be proven at trial;

C. For an injunction enjoining Defendants and their respective officers, agents, servants, employees, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, (1) from directly or indirectly infringing in any manner any of Plaintiffs' respective copyrights or other exclusive rights (whether now in existence or hereafter created), including, without limitation, copyrights or exclusive rights under copyright in Plaintiffs' sound recordings, (2) from causing, contributing to, enabling, facilitating,

or participating in the infringement of any of Plaintiffs' respective copyrights or other exclusive rights (whether now in existence or hereafter created), and (3) to promptly remove from all Digital Services all infringing tracks and promptly terminate the accounts of account holders who are repeat infringers of copyright or exclusive rights in Plaintiffs' sound recordings;

D. For impoundment and destruction of all copies of files embodying infringing copies of Plaintiffs' sound recordings in DistroKid's possession, custody, or control;

E. For prejudgment and post-judgment interest according to law;

F. For Plaintiffs' attorneys' fees and full costs and disbursements in this action; and

G. For such other and further relief as the Court deems proper and just.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand trial by jury of all issues triable by right of jury.


OF COUNSEL:

Glenn Pomerantz
Glenn.Pomerantz@mto.com
Kelly M. Klaus
Kelly.Klaus@mto.com
Rose Leda Ehler
Rose.Ehler@mto.com
Oliver Brown
Oliver.Brown@mto.com
Ariella Park
Ariella.Park@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071-3426
(213) 683-9100

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Louis K. Kettering (#7693)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
kettering@rlf.com

*Attorneys for Plaintiff*


Dated: September 15, 2026